IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Andersons, Inc., | Case No. 3:09 CV 222 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| LaFarge North America, Inc., | |
| Defendant. | |

### INTRODUCTION

This is a breach of contract action arising from a lease of railcars. The parties agree that Ohio law controls this dispute which centers on the post-lease condition of two hundred railcars returned by Defendant LaFarge North America, Inc. ("LaFarge") to Plaintiff Andersons, Inc. ("Andersons"). Andersons claims that LaFarge failed to return the cars in a clean and usable condition. The parties ask this Court to interpret the Lease to determine if LaFarge breached the Lease and, if so, the amount of Andersons' damages. This Opinion constitutes this Court's findings and conclusions pursuant to Federal Civil Rule 52(a).

Three points are clear: (1) the cars were received by LaFarge in good condition at the commencement of the Lease; (2) many of the cars were returned in poor and corroded condition; and (3) there was no joint inspection at the end of the lease term as contemplated by the Lease. The dispute centers not so much on "if" Defendant breached, but more on the extent (and cost) of repairs necessary to bring the railcars into a condition consistent with the Lease terms.

### PRELIMINARY MATTERS

Defendant raises some preliminary matters for this Court to address. LaFarge claims that Andersons is not the real party-in-interest because Andersons' rights under the Lease were transferred

to two financing institutions. This issue is easily resolved. In order to finance the transaction, Andersons sold one hundred railcars to The Vaughn Group, which was later purchased by U.S. Bank, and another one hundred railcars to National City (Exs. 52 & 59). As part of the deal, Andersons had the option to repurchase the two hundred railcars through an option contemplated under the finance documents (Exs. 15, 17–18, 53–54, 60–61, 65), which Andersons later exercised. These financing institutions relinquished any interest in the railcars as confirmed by Notices (Exs. 19 & 58) filed with the Surface Transportation Board pursuant to 49 U.S.C. § 11301(a). The two hundred railcars were repurchased at a total cost of $2,097,432. As a result of the repurchase, Andersons was assigned all rights under the original Lease.

Further, as a practical matter, LaFarge, by its dealings with Andersons during and at the end of the Lease, recognized Andersons' interest in the railcars. Andersons and LaFarge have been in exclusive possession of the railcars. There is no dispute the financial institutions have been paid in full. Also, LaFarge and Andersons attempted to negotiate end-of-Lease payments with each other. Clearly, Andersons is the owner of the railcars, and therefore is entitled to enforce the Lease rights as the real party-in-interest. *See Certain Interested Underwriters at Lloyd's v. Layne*, 26 F.3d 39, 42–43 (6th Cir. 1994). And, in any event, LaFarge is estopped from now attempting to take a position inconsistent with its own conduct. *See Bonner Farms, Ltd. v. Fritz*, 355 F. App'x 10, 14 (6th Cir. 2009) (citing *Hampshire Trust Co. v. Stevenson*, 114 Ohio St. 1, 19 (1926)).

### LEASE TERMS

A Lease dated April 7, 1998 was entered into between Andersons and Tri-Mor Corporation (Ex. 45), and later assigned from Tri-Mor to LaFarge. Pursuant to that Lease, Andersons leased two hundred open top hopper railcars to Tri-Mor / LaFarge for a period of ten years. The Lease term ran

2

from October 1998 until the end of September 2008. The railcars were used to haul aggregate, such as limestone, from LaFarge quarries.

The Lease was triple net, meaning that the lessee was responsible for all repairs to the railcars during the term of the Lease. The railcars were refurbished by Andersons prior to the Lease, including resheeting the railcar interiors, repainting and certain other upgrades. The railcars were originally built in 1980 and, as of the beginning of the Lease in 1998, had an estimated remaining life of approximately twenty-two years.

The Lease[1] provides for inspection of the railcars at the beginning of the Lease (Item 8), with loading of the cars constituting acceptance by LaFarge that the railcars were "fit and suitable." LaFarge was thereafter responsible for cleaning the cars (Item 9) and maintenance (Item 10), which

---

[1]

The Lease states, in part:

ITEM 8     INSPECTION OF CAR. Each of Cars shall be subject to Lessee's inspection before first loading. The loading of each Car shall constitute acceptance thereof by Lessee, and shall be conclusive evidence (a) of the fit and suitable condition of such Car for the purpose of transporting the commodities.

ITEM 9     CLEANING OF CARS. Cars will be delivered suitable for the use set forth in applicable rider and shall be returned in the same condition. Any cleaning of Cars that may be necessary to prepare them for shipment of commodities by or for Lessee or any cleaning required prior to repairs or modifications while in Lessee's service shall be done at Lessee's expense and responsibility unless otherwise agreed in writing.

ITEM 10    MAINTENANCE
(a)     Lessee shall, at its sole cost and expense, maintain the Cars in serviceable condition, free of broken, damaged or missing parts, suitable for the commercial use originally intended, and meeting applicable standards as prescribed by the AAR Interchange Rules and the FRA rules and regulations.
(b)     (1)     Lessee agrees to comply, at its sole cost and expense, with all applicable laws, regulations, directives, statutes, ordinances and rules, including, without limitation, the rules of the FRA, and the AAR Interchange Rules and the rules and regulations of the Environmental Protection Agency . . . with respect to the use and maintenance of each car.

3

included maintaining the cars in "serviceable condition . . . suitable for the commercial use originally intended . . . ."

The Lease required that, at the end of the Lease, representatives from both sides would inspect the railcars and negotiate an "end of lease" payment. The critical section of the Lease (Item 7) states in relevant part as follows:

> RETURN OF THE CARS.
> (a) On the expiration or termination of the term of this Lease, . . . Lessor and Lessee shall jointly inspect the Cars to determine if each Car is clean and free of commodities or residue and complies with the Association of American Railcars ("AAR") Interchange Rules and Federal Railroad Administration ("FRA") Rules and Regulations as provided in ITEM 10a and 10b hereof. The cost of this redelivery shall be borne by Lessee.

## FACTUAL BACKGROUND

Although LaFarge protests that Andersons did not prove what caused the damage to the railcars, Andersons was not required to do so. This is a breach of contract action, not a tort. The proximate cause of the damages to the railcars is not required to be shown. Rather, Andersons must demonstrate LaFarge breached the contract and Andersons suffered damages as a result. *See Cranpark, Inc. v. Rogers Group, Inc.*, 721 F. Supp. 2d 613, 622 (N.D. Ohio 2010). The railcars, which were corroded and contained holes, were not returned to Andersons in an acceptable condition as required under the Lease terms. Thus, the only real issue is the scope and cost of the needed repairs.

In order to determine the necessary repair costs, this Court starts by looking to the condition of the railcars at the beginning of the Lease. No photographs or written summaries reflecting the condition of the railcars at the beginning of the Lease were entered into evidence. However, the testimony reflects the railcars were newly renovated in 1998, and were in good or excellent condition

4

(TR 54). The railcars had been resheeted, restoring them to original or better metal thickness, and were completely repainted (TR 46, 48–49). As noted earlier, pursuant to Item 8 of the Lease, the railcars were accepted by LaFarge without exception.

When the railcars were returned by LaFarge, many of the cars were in poor condition, as confirmed by the several inspections and many photographs. There was excessive corrosion and holes, many cars were not serviceable, and others did not meet AAR or FRA rules (TR 360–65). The trial centered on a "battle of the experts" as to the amount of work needed to return the cars to serviceable condition.

## INSPECTIONS

Rick Gieryng, from Andersons, met Gary Eaton, from LaFarge, at the Lordstown storage yard where the railcars were located for a final inspection in October 2008. However, instead of a joint inspection, as contemplated by Item 7 of the Lease, Eaton, unhappy with Gieryng's inspection findings, left soon after arrival, and Gieryng completed the inspection on his own. Several "independent" inspections followed. The Court will next summarize the findings from these various inspections.

**Richard Gieryng**

Gieryng was Shop Manager with Andersons in 2008 and, as part of his job, he reviewed and directed railcar repairs (TR 66–67). He had performed fleet inspections for some six years and his job included spending time on the road inspecting railcars.

Gieryng met with Gary Eaton of LaFarge at Lordstown to conduct a joint inspection. The railcars were lined up on tracks at the Lordstown storage yard. According to Gieryng, Eaton left shortly after he arrived, asking Gieryng to send a copy of his report. Eaton agreed the railcars were

5

in "rough shape," but did not agree with Gieryng's blanket assessment of repair costs (TR 71). Gieryng sampled fifty cars (TR 70–72), took notes (Ex. 22) and photographs (Ex. 46) over two days (TR 79–80) and prepared a report (Ex. 21), including metal thickness readings of the railcars (TR 74). He felt all cars needed complete resheeting (Ex. 22). His estimated cost to restore the railcars was $8,500,000 (TR 85).

### Jerry Charaska

Jerry Charaska, Director of Field Services for All-Transtek (TR 131), was retained by Andersons. He is in charge of the inspection division and regularly performs pre-lease and post-lease railcar inspections (TR 132). He has been doing inspections since 1977 and performs fifty or more inspection projects per year for both lessors and lessees (TR 133–34).

Charaska selected forty railcars to inspect in August 2009 (TR 135). His report (Ex. 39) found, and his photographs confirm, corrosion and holes were common among the cars, and aggregate remained in many of the cars as well. He described the car conditions as fair to poor (TR 142). Due to the excessive corrosion and holes, he found the cars were not suitable for releasing and that their current condition reflected damage "beyond normal wear and tear" (TR 154). Due to the corrosion, he felt patching alone would not fix the problem. He therefore recommended chlorides be removed from the steel by blasting to avoid continued corrosion. He found all cars required either patching or replacement of the side sheets, and that cars would need to be painted (TR 156–57, 163–65). He prepared a report (Ex. 39), and his cost estimate for repairs was some $15,000 to $35,000 per car which, when averaged, at $25,000 per car totals $5 million (TR 161).

### Andrew Spurlock

Andrew Spurlock, President of Star Fire Engineering, was retained by LaFarge. He had never before been involved in an end-of-lease inspection of railcars. He inspected fifty of the cars over two

6

days in June 2010, shortly before trial (TR 321, 325). He too took photographs (Ex. V), but took no measurements (TR 357). His report acknowledged some repairs were needed and that the vast majority of railcars were not in a serviceable condition (Ex. R). However, he felt patching was appropriate for many of the cars and that corrosion could be corrected by blasting. He described the corrosion on the cars as "moderate to severe." His calculation of damages, which totaled $646,118, did not include corrosion repair.

### Christian Barios

Christian Barios, Manager of Fleet Operations for Trinity Industries Leasing, estimated repair costs for LaFarge. He inspected seventy cars in November 2008. His report (Doc. No. 35) detailed various categories of repairs (wheels, brake shoes, doors, braces, corrosion repair, paint, etc.) at a cost, for one hundred cars, of $956,455, or a total (times two for two hundred cars) of some $1,912,910. The largest components of his estimate was $700,000 for repainting the railcar exteriors and $300,000 for general maintenance.

### Summary

These various estimates for railcar repair are summarized as follows:

| Inspector | Average Cost per Railcar | Total |
| --- | --- | --- |
| Gieryng (Andersons) | $42,500 | $8,500,000 |
| Charaska (All-Transtek) | $25,000 | $5,000,000 |
| Barios (Trinity) | $9,565 | $1,912,910 |
| Spurlock (Star Fire) | $3,231 | $646,118 |

### ANALYSIS

"As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have

7

required greater certainty in the proof of damages for breach of contract than in tort." *Ohio Envtl. Dev. Ltd. P'ship v. Envirotest Sys. Corp.*, 478 F. Supp. 2d 963, 973–974 (N.D. Ohio 2007) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 144 (Ohio Ct. App. 1996) (citations omitted)). Furthermore, "[t]he damages awarded for a breach of contract should place the injured party in as good a position as it would have been but for the breach. Such compensatory damages, often termed 'expectation damages,' are limited to actual loss, which loss must be established with reasonable certainty." *Id.*

This Court, as trier of fact, must determine the credibility of witnesses, and it finds that the highest (Gieryng) and lowest (Spurlock) estimates are simply not credible. Neither one matches up to the testimony and the photographs. Gieryng overreaches and Spurlock "low balls."

This Court carefully weighed the details of the Charaska testimony and Barios report and finds them to be more credible. Their approach seemed more evenhanded. Charaska had excellent credentials and was knowledgeable about the railcar industry. Barios inspected seventy cars -- a third of the total fleet -- and his detailed estimate reflected his firsthand observations, with LaFarge disagreeing only with the cost estimate for exterior paint (TR 295). Both of these inspections found corrosion -- even "severe" corrosion -- (Exs. 27–29) common in the railcars.

While LaFarge claims to have done periodic maintenance throughout the Lease, and claims to have records reflecting the maintenance performed, that testimony and documentation was not introduced at trial. LaFarge offered no evidence that it made efforts to remove the corrosion, or to clean limestone residue from the railcars, patch holes, repair doors or otherwise take steps during the life of the Lease to satisfy the Lease requirements. Further, it made no repairs in anticipation of the end of the Lease.

8

The above summary of testimony and exhibits leads this Court to find by the greater weight of the evidence that LaFarge breached the Lease terms by failing to clean and maintain the railcars pursuant to Items 9 and 10 of the Lease, and by failing to return the cars in a satisfactory condition ("clean and free of commodities or residue") pursuant to Item 7 of the Lease.

This Court further finds, by the greater weight of the evidence, that the cost to bring the railcars into compliance pursuant to the Lease terms is $2,456,455. This number reflects a hybrid of the estimates of Barios (retained by LaFarge) and Charaska (retained by Andersons), and most accurately approaches the actual cost of repairs required by the Lease. As contract damages are meant to do, this amount will place Andersons in as good a position as it would have been but for the breach. *Ohio Envtl. Dev.*, 478 F. Supp. 2d at 974. To arrive at this number, the Court has taken the lowest repair cost identified by Charaska multiplied by the number of railcars -- $15,000 x 200 = $3 million, and the nearly $2 million cost estimated by Barios, and then averaged the two sums -- ($3 million + $1,912,910) ÷ 2 for a total of $2,456,455.

### OTHER MATTERS.

**Holdover Rent**

Andersons also claims it is entitled to holdover rent as part of its damages. It relies on Item 7(d) of the Lease, which states as follows:

> Lessee shall have a reasonable time to assemble and repair the Cars pursuant to ITEM 7a, 7b, and 7c hereof. However, any Car not available for inspection and/or not in compliance with AAR Interchange Rules and the FRA Rules and Regulations as provided by ITEMS 10a and 10-b within thirty (30) days after the expiration or termination of this Lease shall be subject to holdover rentals starting thirty (30) days after lease expiration or termination . . . The holdover rentals shall then continue until the subject cars are available for inspection as provided by in ITEMS 7(a) and in compliance with the Interchange Rules and FRA Rules and Regulations as provided in Items 10a and 10b.

9

Given the above findings, it can hardly be disputed that while LaFarge made the railcars available for inspection, those railcars were not in compliance with Items 10(a) and 10(b) of the Lease. The testimony is clear that all the cars required *some* maintenance and repair -- some more than others -- and there is no testimony that *any* of the cars were serviceable in their condition at the end of the Lease. The railcars were offered to Andersons at Lordstown, Ohio, and Andersons had full opportunity to take control of those railcars at the location. That location was agreed upon by the parties toward the end of the Lease and, even though Andersons was not satisfied with the condition of the railcars, Andersons had the ability to "take charge" and do what it wanted with those railcars. However, with LaFarge's failure to conduct a joint inspection, and with both parties conducting followup inspections, the railcars were in essence tied up with this litigation.

However, Andersons is not entitled to holdover rent indefinitely. "It is a cardinal rule of contracts that an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided." *S & D Mechanical Contractors v. Enting Water Conditioning Sys.*, 71 Ohio App. 3d 228, 238 (Ohio Ct. App. 1991). This means Andersons was under a duty to exercise reasonable care and diligence to minimize its damages. *Id.* Andersons could have placed LaFarge on notice that Andersons was going to either make the necessary repairs or salvage the railcars and give LaFarge the opportunity to object.

In light of the circumstances of this case, this Court finds that LaFarge's violation of Item 7(d) of the lease entitles Andersons to holdover rent for one year from the end of the Lease term. Andersons could have taken some steps during this year to mitigate its losses, but it failed to do so and cannot claim damages without end. *See Kamistros v. Holeman*, 2005 Ohio 660, ¶ 36 (Ohio Ct. App. 2005) ("those damages that a plaintiff could have avoided with reasonable effort and without

undue risk or expense cannot be charged against a defendant"). There is no dispute that the holdover rent is $195 per car, per month. This amounts to $1,282.19 per day (($195 x 200 x 12) ÷ 365 = $1,282.19). Therefore, the amount owing for holdover rent for a reasonable period -- one year -- is $468,000 ($1,282.19 x 365) -- rounded up.

This Court does not find persuasive LaFarge's argument that holdover rent is equivalent to punitive damages or liquidated damages and is therefore unenforceable. While Andersons did have custody and control over the railcars once LaFarge released them at Lordstown, LaFarge made use of those cars by conducting followup inspections, including the Spurlock inspection in July 2010. LaFarge is hard pressed to argue that Andersons should have disposed of the railcars, at which point LaFarge would not have had the ability for its expert to inspect those railcars. While LaFarge argues that Andersons should have mitigated its damages by selling the railcars for scrap, LaFarge acknowledges there was no resale or leasing market for these railcars through 2010. In light of all the above, this Court cannot find fault with Andersons waiting some period of time for LaFarge to complete its inspections and to try to reach an agreement on a dollar amount.

**Stipulated Loss Value**

Andersons also claims it is entitled to the additional recovery of the stipulated loss value. It appears Andersons has lost faith in this argument because it is not mentioned in its Proposed Findings of Fact and Conclusions of Law (Doc. No. 56). In any event, the Court agrees with LaFarge that this is a duplicative remedy (Doc. No. 54 at 22–23) and that Andersons is not entitled to this amount in addition to the damages already awarded. *Textron*, 115 Ohio App. 3d at 144 ("damages for breach of contract should place the injured party in as good a position as it would have been but for the breach").

**Overdue Rent**

Andersons claims it is entitled to overdue rent pursuant to Item 3 of the Lease. However, Andersons had control and custody of the railcars as of October 2008, and this claim is simply duplicative of Andersons' claim for holdover rent. It is not entitled to past due rent as well. Similarly, Andersons is not entitled to interest under the Lease for past due rent. *See id.*

**Switch Fees and Storage Fees**

Andersons claims it is entitled to switch fees and storage fees pursuant to Item 25 of the Lease. As with its claim for stipulated loss value under the same Item of the Lease, the Court finds no grounds for such an award. Item 25 deals with remedies of default and these fees are not appropriate here where Andersons has had control and custody of the railcars since October 2008 and the ability to store and place these cars where it wanted them.

**Attorney Fees**

Andersons also makes a claim for attorney fees under Item 25 of the Lease.[2] Under Ohio law, contractual attorney fees provisions are unenforceable under the following circumstances: (1) when the parties do not share an equal bargaining position; (2) when the terms of the provision are not freely negotiable; (3) when the attorney fee provision promotes litigation or illegal acts; or (4) when the attorney fee provision acts as a penalty. *K & A Cleaning, Inc. v. Materni*, 2006 Ohio 1989, ¶ 10

---

[2]

ITEM 25
Lessee shall pay Lessor's costs and expenses incurred by reason of Lessee's breach or default which shall include, without limitation, . . . and collecting rents and professional fees and expenses with respect to or incurred by reason of the breach or default, including legal fees and expenses for advice and legal services in any actions or proceedings which Lessor may commence or in which Lessor may appear or participate to exercise or enforce any rights or remedies or to protect or preserve any rights or interests, and in all reviews of and appeals from such actions or proceedings.

(Ohio Ct. App. 2006) (citing *Motorist Insurance Co. v. Shields*, 2001 Ohio 2387 (Ohio Ct. App. 2001)); *see also Big Lots Stores, Inc. v. Luv N' Care, Ltd.*, 302 F. App'x 423, 428 (6th Cir. 2008) (noting that under Ohio law attorney fee provisions are unenforceable unless "specifically negotiated" between the parties).

This Court agrees with LaFarge that this was a standard paragraph in the Lease and was not negotiated between the parties. Also, this provision was a "one-way street" that ran only in favor of Andersons. Further, this Court finds that there was a legitimate dispute between the parties as to the amount of the repairs and that both sides have "unclean hands" in the manner the "joint inspection" was handled at the outset. This Court declines to award Andersons its attorney fees.

## CONCLUSION

Andersons is granted judgment in the amount of $2,924,455, with interest from the date of this Judgment at the Ohio statutory rate, and its costs pursuant to Federal Civil Rule 54(d)(1).

IT IS SO ORDERED.

                                                      s/ *Jack Zouhary*
                                                      JACK ZOUHARY
                                                      U. S. DISTRICT JUDGE

                                                      June 9, 2011